## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| FRIEDA MAE ROGERS f/k/a FRIEDA MAE ROEN and PREMIER TRUST, INC., | |
| Plaintiffs, | |
| v. | Civil Action No. 18-116-CFC |
| WILMINGTON TRUST CO. | |
| Defendant. | |

---

David A. Felice, BAILEY & GLASSER, LLP, Wilmington, Delaware;
T. Randolph Catanese, Doug R. Hume, David Y. Yoshida, CATANESE &
WELLS, Westlake Village, California

*Counsel for Plaintiff*

Benjamin P. Chapple, Justin M. Forcier, REED SMITH LLP, Wilmington,
Delaware; John M. McIntyre, Traci S. Rea, REED SMITH LLP, Pittsburgh,
Pennsylvania; Elizabeth J. Betta, M&T BANK, Buffalo, New York

*Counsel for Defendant*

## **MEMORANDUM OPINION**

February 25, 2021
Wilmington, Delaware

_Colm F. Connolly_

COLM F. CONNOLLY
UNITED STATES DISTRICT JUDGE

As required by Federal Rule of Civil Procedure 52(a)(1), I have set forth separately below my findings of fact and conclusions of law after a four-day bench trial in this breach-of-trust case.

There are two plaintiffs in the case: Frieda Mae Rogers (formerly known as Frieda Mae Roen), the beneficiary of the Frieda Mae Roen Trust (the Roen Trust); and Premier Trust, Inc., the current trustee of that trust. The sole defendant is Wilmington Trust Company, the former trustee of the Roen Trust. (Wilmington Trust Investment Advisors, Inc. (WTIA) was named as a defendant in the Amended Complaint but was dismissed at trial by stipulation when Wilmington Trust agreed that it was legally responsible for any actions taken by WTIA. Tr. 389.)

The parties tried four claims from the Amended Complaint: (1) Premier's breach of fiduciary duty/breach of trust claim; (2) Premier's equitable fraud claim; (3) Premier's federal claim under the U.S. Investment Advisers Act of 1940; and (4) Rogers's financial abuse of an elder claim.

## FINDINGS OF FACT

### I.   General Background

The Roen Trust is a Delaware trust that traces its roots to the so-called "original trust" created in 1934.  The original trust was partitioned in 2004.  One of the resulting trusts was the Rogers Family Trust.  In 2008 the Delaware Court of Chancery partitioned the Rogers Family Trust into five newly created trusts, one of which was the Roen Trust.

Rogers is the beneficiary of the Roen Trust.  Wilmington Trust was the trustee of the Roen Trust upon its formation in November 2008.  In December 2008, Rogers appointed Wilmington Trust to act as the Trust's advisor. Wilmington Trust served as the trustee and advisor of the Roen Trust until Rogers appointed Premier to take on those roles in 2015.  Under Delaware law, "a trust advisor is a fiduciary, somewhat in the nature of a co-trustee, and is sometimes described as a quasi-trustee." *Lewis v. Hanson*, 128 A.2d 819, 828 (Del. 1957) (internal citations omitted), *aff'd sub nom. Hanson v. Denckla*, 357 U.S. 235 (1958); *see also Wilmington Tr. Co. v. Stuart*, Civil Action No. 6793, 1983 WL 18030, at *10 (Del. Ch. July 21, 1983) ("A trust advisor has a power of control when certain actions of the trustee are made subject to his approval under the terms of the trust."), *aff'd*, 474 A.2d 121 (Del. 1984).

2

Rogers was 61 years old when the Roen Trust was created. By the time of trial, she was 74 and cut a sad figure. Wheelchair bound and hard of hearing, Rogers fell asleep during much of the trial, including while on the stand during her cross-examination, *see* Tr. 163–64. Rogers never finished high school and eloped at the age of 19 for the first of her three marriages, all of which ended in divorce. She had in vitro fertilization at the age of 65—paid for by the Trust—and gave birth to triplets, one of whom died shortly after birth and another of whom suffered brain damage in the womb. Rogers had little knowledge of or interest in financial matters except insofar as she spent a lot of money and was always desirous of more money to spend. She long ago "went through" (her words) $30 million she inherited upon her mother's death in 1993; and although she received more than $12 million from the Roen Trust between 2009 and 2014, Rogers was in constant battle with Wilmington Trust to obtain larger distributions.

The Roen Trust exists by virtue of a written Trust Agreement. The Trust Agreement empowered Rogers as of 2013 to replace and appoint both the trustee and the advisor of the Trust. For all times relevant to this case, the Trust Agreement granted the trustee, with the consent and approval of the advisor, the discretion to invest and sell trust assets as the trustee deemed advisable or desirable, and to spend so much of the Trust's income and principal as the trustee saw fit. JX-02.

3

The Trust Agreement contains an exculpation clause that limits the trustee and advisor's liability to "fraud, willful misconduct or gross negligence." JX-02.  Rogers testified at trial that no one explained to her before she consented to the 2008 trust partition that this exculpation provision immunized the Roen Trust's trustee and advisor from liability for negligent misconduct.  *See, e.g.*, Tr. at 85. But Wilmington Trust adduced credible testimonial and documentary evidence at trial that established that Rogers's personal attorney Myron Sugarman proposed the exculpation provision and that Sugarman obtained and provided a notarized consent form signed by Rogers that affirmed her consent to the provisions in the Trust Agreement that created the Roen Trust.  That signed consent affirmed that Rogers had read the Petition For Division that partitioned the Rogers Family Trust, the Trust Agreement, and a redlined version of the Trust Agreement that showed how it was amended to create and govern the Roen Trust.  Thus, I reject Rogers's testimony that she never consented to the exculpation clause.

## II.    Wilmington Trust's Administration of the Roen Trust

Of the $33.5 million in assets distributed from the Rogers Family Trust to create the Roen Trust in 2008, $25.4 million (or 75%) was invested in six Ballentine Private Funds.  These funds were later renamed the Wilmington Private Funds.  Non-party Wilmington Trust Investment Management (WTIM), a wholly owned subsidiary of Wilmington Trust, was the general partner or managing

member of each of the Wilmington Private Funds. From January 2009 through

December 2014, the Trust's investments in the six Wilmington Private Funds had a

combined net gain of $23.9 million. The last purchase of any Wilmington Private

Fund shares for the Trust occurred on January 3, 2011.

The Wilmington Private Funds were only offered to Wilmington Trust

clients and Wilmington Trust affiliates. Private Placement Memoranda or "PPMs"

for the Funds were provided by Wilmington Trust to Rogers in 2010 and 2011 and

produced by Rogers in discovery. The PPMs disclosed that investors in the Funds

were prohibited from selling, assigning, or transferring their interests in the funds

except with the prior written consent of WTIM and that this consent could be

withheld in WTIM's absolute discretion. Although this disclosure implies that

WTIM would consider consenting to a transfer of assets to another institution,

WTIM had an unwritten internal policy that it would never consent to the transfer

of Wilmington Private Fund assets outside of Wilmington Trust. WTIM's Director

of Fund Operations, Richard Capuano, testified at trial that WTIM adopted this

unwavering policy because otherwise "WTIM would no longer receive the

investment management fee normally paid by Wilmington Trust" and WTIM

"would have to perform, or hire another company to perform, the services

normally provided by Wilmington Trust including issuing client statements,

tracking contributions and withdrawals, and providing K-1s." D.I. 357 ¶ 69. As a

result of this unwritten but unwavering policy, if investors in the Wilmington Private Funds wanted to move their assets to another financial institution, they had no choice but to liquidate their holdings and, in all likelihood, incur substantial capital gains and tax liabilities.

Wilmington Trust never told Rogers that WTIM would never consent to a transfer of the Trust's interests in the Wilmington Private Funds outside of Wilmington Trust. I reject Wilmington Trust's insistence that an email sent to Rogers in December 2012 and a follow-up letter sent to her in January 2013 disclosed WTIM's "never consent" policy. Wilmington Trust told Rogers in those communications that "some of the assets" being distributed to her at the time as a result of the dissolution of the Rogers Family Limited Partnership were "not portable to other financial institutions." But neither these statements nor any discussions Wilmington Trust purported to have with Rogers about these unidentified assets constituted a disclosure that WTIM had a policy of never consenting to a transfer of Wilmington Private Fund assets to another financial institution.

Chris Sullivan was Wilmington Trust's investment advisor for the Roen Trust. Sullivan testified that when the Rogers Family Trust was partitioned and the Roen Trust was created, he chose to keep the Roen Trust invested in the Ballentine Funds "[b]ecause they were good investments and at the time it was Wilmington

Trust's best thinking." Tr. at 614:8–9.  Sullivan made no suggestion in his trial

testimony that Wilmington Trust gave any thought to the circumstances of Rogers

or her remaindermen in formulating an investment strategy for the Roen Trust.  In

truth, Sullivan could not have tailored the Trust's investment strategy to Rogers or

the remaindermen, because he knew nothing about their circumstances or needs

other than the fact that Rogers was in the highest tax bracket and lived in

California.  Tr. at 667–669.  Based on Sullivan's trial testimony and the documents

Wilmington Trust introduced in support of that testimony, the annual review of the

Trust's performance conducted by Wilmington Trust could charitably be described

as pro forma.

      In fairness to Sullivan and Wilmington Trust, Rogers was not cooperative

with Wilmington Trust.  Tonia Kennedy was the Trust Officer for the Roen Trust

and Wilmington Trust's principal point of contact with Rogers.  Kennedy spoke

with Rogers by phone two to three times each month and communicated with

Rogers by email through Rogers's personal assistant, Shawna Baker.  Kennedy

testified that she repeatedly asked Rogers to provide Wilmington Trust with

information about Rogers's personal circumstances, financial needs, and expenses.

Rogers expressly denied this at trial (*see* Tr. 96–97, 106), but the documentary

evidence makes clear that Kennedy's testimony about this matter is accurate.  In a

letter to Rogers dated August 5, 2011, for example, Kennedy wrote: "In order to

continue to assist you in a meaningful way and fulfill our duties as a trustee, we really need you to provide more detailed information regarding your personal expenses and the expenses of [Rogers's] ranch." DX-424 at 1. In another 2011 letter, Rogers's personal attorney wrote to Wilmington Trust: "My client requests that any inquiries as to her lifestyle and standard of living cease and that detailed statements of expenses cease. Again, what purpose does this serve?" DX-39.

On five occasions, Kennedy and Sullivan made visits to Rogers in California to inform her about the state of the Trust and answer any questions she had. Rogers made sure the meetings were short—one took ten minutes—and asked no questions about the Trust's investments. Rogers admitted at trial that Sullivan and Kennedy "tried to explain the portfolio to me" but that their explanation was "way over my head." Tr. 104.

One thing Rogers and Wilmington Trust agreed on was that Rogers continually asked for larger distributions from the Trust. As Rogers conceded at trial: "I was always asking [Wilmington Trust] for extra money . . . on top of the monthly [$]150,000" Wilmington Trust distributed to her from the Trust. Tr. 101. Ultimately, Rogers's constant requests for more money resulted in the conversion of the Roen Trust to a so-called "unitrust" that annually paid Rogers at a minimum a fixed percentage of the market value of the assets held by the Trust.

8

Over time, Shawna Baker became increasingly involved in Rogers's financial affairs and relationship with Wilmington Trust. Baker kept track of all the financial documents mailed to Rogers by Wilmington Trust, requested discretionary disbursements from the Trust for Rogers, and emailed Kennedy to ask clarifying questions about the Roen Trust and Rogers's other accounts with Wilmington Trust. Rogers described Baker as the manager of her ranch (Tr. 139) and her best friend (Tr. 89). In Rogers's words, "Shawna came into my life and saved me" just after Rogers's tragic experience with in vitro fertilization. Tr. 208.

As kind as Baker may have been to Rogers at times, there were troubling signs that Baker and Baker's husband Steve may have been taking advantage of Rogers. As Baker's involvement in Rogers's finances increased, so too did Rogers's requests for discretionary disbursements (i.e., disbursements above and beyond the minimum payments guaranteed to Rogers); and many of these discretionary disbursements appeared to directly benefit the Bakers. In July 2013, Rogers requested a $1.5 million disbursement to buy 900 acres of land adjacent to the ranch the Bakers managed for her. In early 2014, Rogers asked Kennedy to approve a $9 million disbursement to expand Rogers's cattle business to raise Wagyu cattle for beef that could be marketed to high-end restaurants. Kennedy didn't think Wilmington Trust would approve such a large disbursement and persuaded Rogers to submit instead a request for a $9 million loan to Wilmington

9

Trust's loan committee.  The business plan set forth in the loan application Rogers

provided Wilmington Trust in March 2014 disclosed that the Bakers owned 50%

of Rogers's cattle business.  DX-94.

Kennedy testified that this business plan gave rise at Wilmington Trust to a

"concern that Ms. Rogers was being taken advantage of" by the Bakers.  Tr. 464.

But if Wilmington Trust actually had such a concern, it did nothing to act on the

concern.  On the contrary, Wilmington Trust continued to manage its relationship

with Rogers through Shawna Baker.

In June 2014, while Rogers's $9 million loan request remained pending,

Baker sent Kennedy this email from her iPhone to follow up on Rogers's request

for a $1.4 million discretionary disbursement to buy "raw land" to expand the

ranch:

> Hello Tonia
> What did the [Trust's] board say we are very anxious we
> do not wanna loose out on this deal then she would never
> have to see [Rogers's ex-husband] Erik again!!
> Also Tonia I expect by next year those cows will making
> her some income!!  I'm really trying to get some horse
> sold so we can prove to you guys we start bringing in a
> income not just money going out  . . .
> Please tell me the board ok?????
> Shawna

DX-100 (ellipses, punctuation, and spelling in original).  Kennedy emailed Baker

back ten minutes later to say that Wilmington Trust had approved the $1.4 million

disbursement and that she "will check with Chris [Sullivan] to get the timing of

when we'll have the funds to wire to Freida" and would "be in touch shortly" to

confirm the timing of the wire transfer. *Id*. Baker then replied with this email:

> Ok thank you I'll prove to the board I can teach Frieda to
> earn money !!!!  So please let me know when u have and
> idea how quickly we can get the money . . I won't let the
> board down I sold a half breed at 5 months old weighed
> 875 pounds case he was nursing off 5 of my Jersey cows
> and usually at that age they weigh 300 lb the mark was
> up he pulled in 1,500.  Our cost was fuel to sale yard that
> was it!!!
> So I'll start a contract with the agent but please have
> Chris [Sullivan] let me know ASAP.
> Thank you Again.
> Shawna and Frieda

JX-18 (ellipses, punctuation, and spelling in original).  Wilmington Trust wired the

$1.4 million to Rogers's personal account six days later.

Rogers's request for disbursements for the remainder of 2014 were

significantly above what she had requested in prior years, and, according to

Kennedy, "concerned" Wilmington Trust because, if approved, the requests could

prematurely exhaust the Trust.  But any concern on Wilmington Trust's part didn't

stop it from approving the requests.  In August 2014, Wilmington Trust approved a

$300,000 distribution to cover Rogers's medical expenses. DX-105.  The

following month, it approved a $193,000 disbursement for "unanticipated hay

expenses" at the ranch. *Id*.  And in November 2014, it approved Rogers's request

for $150,000 for Christmas shopping.

Kennedy met with Wilmington Trust's loan committee on December 4, 2014 to review Rogers's pending request for the $9 million loan for the cattle business. On December 5, Kennedy notified Rogers by letter that "[t]he Committee has a few questions regarding the business plan submitted by Shawna before it will make a decision regarding this request." DX-107. Kennedy set forth in the letter numerous requests for information about the business plan. Kennedy also asked in the letter for permission to speak with Rogers's accountant about the possible gift tax implications of structuring the business in the manner described in the business plan, and she requested a copy of the LLC agreement for the cattle business. *Id*

According to Kennedy, "at some point" after Rogers's $150,000 Christmas shopping request—likely in late November or early December 2014—Rogers and Kennedy spoke privately by phone. Kennedy testified that during this call, Rogers said that Shawna had told her that she had to use the $150,000 Christmas money "on other people." Tr. 474. When Kennedy told Rogers that "that was not the case," Rogers said she "was going to send [Kennedy] a secret note, and in the secret note she would give [Kennedy] a telephone number for [Kennedy] to be able to call her so that whenever there was a request for, like, a special distribution, [Kennedy] was supposed to call her just to kind of talk to her about it." *Id*. Kennedy testified that Rogers later sent Kennedy the "special note." *Id*.

Wilmington Trust never offered the note as evidence at trial and never

adduced testimony about the note's contents.  Kennedy testified that after she

received the note, she again spoke with Rogers on the phone, but that Rogers said

on that occasion that "everything was fine with Shawna." *Id.* With respect to this

second call, Kennedy testified:

> So I don't know.  At that point my interactions with
> [Rogers] became a lot more limited.  I would call only to
> her home.  She would not be available.  The phone would
> just ring.  There wouldn't be like an answering service or
> anything.  So I was concerned.  I didn't know what was
> going on, and I'm far, I'm very far.  She's not in
> communication with her children or with her family
> members, so I was concerned for her.

Tr. 474–75.

The exact timing of this second call was never made clear at trial.  The call

appears to have occurred just before or just after December 19, 2014.  On that date,

Kennedy spoke with Shawna Baker.  Kennedy provided a summary of the

December 19 call with Baker and the events that immediately preceded and

followed the call in a contemporaneous memorandum she wrote for Kemp

Stickney, Wilmington Trust's Chief Fiduciary Officer.  The memorandum reads as

follows:

> Frieda left a message for me regarding a letter I sent her
> to sign requesting a discretionary distribution from her
> trust. Frieda, her assistant and her assistant's husband
> called and spoke to [one of Kennedy's work colleagues].
> Supposedly, they wanted to know if the Committee made

13

a decision about the business plan.  They asked that I
return their call.  I called, but no one answered.  I left
Shawna a message.

Shortly after leaving the message, Shawna returned my
call.  She claimed Frieda had left, but she would discuss
it with her.  She wanted to know if a decision was made
about the business plan.  I explained that we would
discuss the plan with them at our meeting in January.  At
that point, she became a little irate.  She accused us of
not wanting Frieda to have her money or share the money
with her.  She ranted for about 10-20 minutes and
explained that Frieda would probably move her Trust.
She also said that she would tell Frieda that we would not
proceed with the plan until meeting with them.

Shawna also tried to ask me questions about my recent
conversation with Frieda, but she became even more
angry when I would not disclose the information.  At the
end of the call, she claimed she was washing her hands
with the matter.

[Fellow employee] Regina listened to the call and can
confirm my statements regarding the call.

About an hour after the call, Frieda called and left a
message about the letter I sent. She did not mention
anything about the business plan.

I guess we should discuss. I'll send a request for a
meeting.

DX-109.

Baker's threat that Rogers might move the Trust to another trustee sprung

Wilmington Trust into action.  Plans were made for Stickney, Sullivan, and

Kennedy to meet with Rogers on January 8, 2015.  And on December 24, 2014

Kennedy approved Rogers's requests for distributions of "$100,000 for additional Christmas shopping and $100,000 towards her American Express bill." DX-112 at 2.

Asked at trial to explain the purpose of the planned January 2015 meeting, Kennedy testified: "we were going to meet with -- we were going -- you know, they were like, well, just --people were just emotionally involved, but let's, you know, try and, you know, meet with her, see what happens, and maybe we can move forward." Tr. 475. Kennedy, Stickney, and Sullivan flew to California the week of January 8 for the meeting, only to be told by Shawna Baker when they arrived that Rogers would not meet with them and that Rogers intended to fire Wilmington Trust as trustee. Notably, no one from Wilmington Trust thought it necessary at this time to contact the applicable authorities in California to investigate whether the Bakers were taking advantage of Rogers.

## III.   Premier Takes over as Trustee

On January 15, 2015, Rogers's personal attorney, James Cunningham, notified Wilmington Trust by letter that Rogers had terminated Wilmington Trust as trustee. The termination letter reads in relevant part:

> Please follow your process to expedite the transfer of this trust to the new trustee and please provide Premier Trust, Inc., and I with the contact information and name of persons assigned to close out Frieda's interest in the above trust.

> Mark Dreschler, President of Premier Trust, Inc. will contact whomever·you designate to follow up on the expeditious transfer of the trust assets to Premier Trust, Inc.
>
> I understand that many of the assets are your own proprietary funds and understand that it may take time to liquidate those assets. However, the publicly traded and cash equivalents, etc., should be transferred as soon as possible. Mr. Dreschler will provide you with transfer instructions. You should discuss with Mr. Dreschler who should prepare the 2014 income tax return. You should also discuss with Mr. Dreschler when and whether to liquidate certain publicly traded holdings of the trust.

DX-113.

On January 22, 2015, Cunningham emailed Kennedy to confirm that she had received the termination notification. JX-22. Cunningham requested in his email that Kennedy send him within 24 hours the Tax Identification Number (TIN) of the Trust, the last Trust statement, and the name of a contact at Wilmington Trust's "Closing Department." He also asked that Kennedy provide him for each of the Wilmington Private Funds the PPMs and "any redemption paperwork." Although he asked for the Wilmington Private Funds information "as soon as possible," he also said that if that information "will take time to gather, please do not delay sending the other information and documents requested in this email." *Id.*

The next day Kennedy sent an email to Cunningham and Dreschler "in response" to Cunningham's termination notice and January 22 email. Kennedy's

16

January 23 email, which was approved in advance by Sullivan, reads in relevant part:

> First, I'm not sure if you're aware, but Wilmington Trust Company is currently serving as the Advisor of the Frieda Roen Resulting Trust.  Please let me know if Frieda desires for us to continue to serve as Advisor.  If not, please forward document(s) that remove Wilmington trust Company and appoints a new Advisor,
>
> Second, we will work with Premier to ensure a smooth transition.  As stated previously, I am the contact while we terminate Frieda's Trust at Wilmington Trust Company.
>
> Third, as you may be aware, *there are significant gains on assets within Frieda's Trust that are not transferable to Premier.  We will forward correspondence shortly to all parties involved (including Ms. Roen) so that everyone is aware of the gains associated with liquidating the assets for transfer.*
>
> Fourth, since Wilmington Trust is no longer trustee, we can't continue to make payments to Frieda.  However, we will seek approval to advance funds to Premier so that Premier is able to make Frieda's next monthly distribution which is scheduled to be sent on 2/17th.  Kindly arrange for Premier to forward delivery instructions as soon as possible.
>
> Additionally, since Wilmington Trust is no longer trustee, we will not prepare the 2014 fiduciary income tax return on behalf of the trust.  However, we will forward a tax worksheet to Premier so that Premier can complete the tax return.
>
> We will forward the TIN and 12/31st statement sometime this afternoon.

> We will be in touch shortly regarding your request for
> Private Placement Memorandums[.]

JX-22 (emphasis added).  An hour later, Kennedy emailed Cunningham and

Dreschler the Trust's TIN and December 31, 2014 statement.

On January 27, Kennedy emailed Cunningham and Dreschler a letter that

stated in relevant part:

> I understand Ms. Roen has decided to remove
> Wilmington Trust as trustee from the [Roen] Trust.
> However, as we begin to review the Trust portfolio *in
> anticipation of possibly selling the [Wilmington Private]
> funds that are not transferable to the successor trustee,
> we want to inform you of the capital gains associated
> with liquidating those assets.  Based on the enclosed lot
> detail report, we estimate capital gains in excess of $9
> million if the Wilmington proprietary funds are
> liquidated since they are not transferrable outside of
> Wilmington Trust.*  As you are aware, this will result in a
> tax liability to the Trust in excess of $2.2 million dollars.
> Also, please note these figures may change as the 2014 k-
> 1s are received.
>
> We are willing to work with the successor trustee to
> make the transition as efficient and cost effective as
> possible.
>
> In addition, we are flexible and may be amenable to an
> arrangement to spread the tax liability over multiple tax
> years.
>
> Please let me know if there are questions or if you are
> interested in discussing the matter further.

JX-23 (emphasis added).

Premier argues that Kennedy's January 23 email and January 27 letter "were false, incomplete and misleading" because they "stated that the [Wilmington Private Funds] had to be liquidated because Rogers elected to retain Premier as her new trustee."  D.I. 359 at 41; *see also id.* at 41–42 ("Kennedy emphasized that the [Wilmington Private Funds] had to be liquidated.").  I do not agree that Kennedy expressly stated in either the January 23 email or the January 27 letter that because Premier replaced Wilmington Trust as the trustee the Trust's holdings in the Wilmington Private Funds had to be liquidated.  But I agree that the January 23 email implied that Premier had no choice but to liquidate the Wilmington Private Fund assets; and I find that Premier reasonably understood the January 23 email to communicate that Premier had no choice but to liquidate those assets.  I base these findings on these two sentences from the email:

> [T]here are significant gains on assets within Frieda's Trust that are not transferable to Premier.  We will forward correspondence shortly to all parties involved (including Ms. Roen) so that everyone is aware of the gains associated with liquidating the assets for transfer.

JX-22.

The January 27 letter, on the other hand, implies that liquidation was not necessarily required.  I base this finding on the statements in the letter that (1) Wilmington Trust was "begin[ning] to review the Trust portfolio in anticipation of *possibly* selling the [Wilmington Private] funds that are not transferable to the successor trustee," JX-23 (emphasis added); (2) "we estimate capital gains in

19

excess of $9 million *if* the Wilmington proprietary funds are liquidated," *id.*
(emphasis added); and (3) "we are flexible and may be amenable to an
arrangement to spread the tax liability over multiple tax years," *id.* This
conditional language and the offer of a potential arrangement to spread out the tax
liability over time suggest (and should have been read by Premier to suggest) that
liquidation of the Wilmington Trust Funds was not preordained. That said, the
letter does not suggest in any way *how* Premier could avoid liquidation.

In an ideal world, the ambiguities in the January 23 email and the January 27
letter would have prompted communications between Wilmington Trust and
Premier to clarify whether the liquidation of the Trust's assets in the Wilmington
Private Funds could be avoided and, if so, how. But Premier did not ask for
clarification or follow up on the implicit suggestions in the January 27 letter that
liquidation was not preordained. And Wilmington Trust, for its part, did not offer
clarification of Kennedy's email or letter; nor did it ever share with Premier how
liquidation of the funds could be avoided.

Wilmington Trust states in its posttrial briefing that "Wilmington Trust
advised Premier that, although the funds could not be transferred, Wilmington
Trust could continue to hold the Wilmington Private Funds such that they need not
be liquidated." D.I. 362 at 40. But I flatly reject this assertion. At trial, Kennedy
testified on direct examination that in her January 27 letter she was "saying that

there was no requirement at that point to sell these proprietary assets." Tr. 480.

Kennedy explained that "we could have held them in a custodian relationship or as

an agent for . . . the trust on behalf of Premier Trust, and they could have decided

to liquidate [the assets] over multiple tax years if that's what they decided." Tr.

480. But the January 27 letter says nothing about a custodial relationship and on

cross examination Kennedy admitted that she never told Premier that maintaining a

Wilmington Trust custodial account for the Trust's assets in the Private Funds

could avoid liquidation:

> Q.    [Wilmington Trust's counsel] had asked you, did
> you have an understanding that one of the options was
> that the funds could be held in a custodial account?  Do
> you remember that question?
> A.    Yes.
> Q.    Okay.  Do you see any language in [the January 27
> letter] where the words custodian or custodial account are
> used?
> A.    No, but I see language that says, we are willing to
> work with the successor trustee to make the transition as
> efficient and as cost-effective as possible.
> Q.    When you were asked by [counsel] who spoke
> with Mr. Cunningham after you sent this letter, I believe
> your testimony was you never spoke to him?
> A.    Yes, I don't recall speaking to him.
> Q.    So you never spoke to Mr. Cunningham at any
> time from or after the date of this letter, January 27,
> 2015, advising him that one of the options was a
> custodial account.  That's true; right?
> A.    That's true.
> Q.    And you never told that to Mr. Dreschler, did you?
> A.    No, because we told him we would work with
> them and they never wanted to work with us.

> Q.     But you never told Mr. Dreschler one of the
> options was a custodial account; is that correct?
> A.     If someone says they're willing to work with you
> and the person never responds and says, well, what do
> you mean, then that's it.
> Q.     I understand that, but you never told him there's a
> custodial account option if you want it; right?
> A.     I told him we were willing to work with him.
> Q.     But you never said, we'll give you a custodial
> account if you want it; right?
> A.     I never said those exact words.

Tr. 569–70. Based on this testimony and Dreschler's testimony that "we
understood that [the funds] couldn't be transferred and they had to be liquidated,"
Tr. 223, I find that Wilmington Trust never told Premier that Wilmington Trust
could hold the Trust's assets in the Wilmington Private Funds under Premier's
trusteeship and never shared with Premier how Premier could avoid liquidation of
the Wilmington Private Funds.

On February 5, Dreschler told Kennedy in an email: "please consider this
your authorization to liquidate all the nontransferable Wilmington Trust
proprietary funds currently in the Trust." DX-122. Cunningham was not copied
on this email; and under the Trust Agreement, liquidation could not occur without
the advisor's consent, which Wilmington Trust was not willing to give because of
the tax implications associated with a liquidation. Accordingly, in a February 6
email sent to Cunningham and cc'd to Dreschler, Kennedy told Cunningham:

> I'm not sure if you're aware, but [Wilmington Trust] has received instructions from Premier to liquidate all non-transferrable Wilmington Trust proprietary funds currently in the [Roen] trust. As the Advisor of the Trust, [Wilmington Trust] does not consent to the sale of the assets. If [Wilmington Trust] has been removed as Advisor, please forward copies of the Removal and Appointment documents for our records.

PX-70.

On February 10, Cunningham sent Kennedy a notice of appointment executed by Rogers that removed Wilmington Trust and named Premier as the Trust's advisor. Later that day, Dreschler emailed Kennedy, stating that "now that we are trust advisor, please execute the directives to sell the proprietary funds and transfer the other assets per instructions previously provided." PX-72. Thereafter, Wilmington Trust liquidated the Trust's holdings in the Wilmington Private Funds and transferred the sale proceeds and remaining Trust assets to Premier. Neither side addressed in its proposed findings of fact whether the Roen Trust incurred tax liabilities because of the Wilmington Private Funds' liquidation. Accordingly, I make no finding of fact with respect to that issue. *Cf. United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.).

On March 9, 2015, at the direction of her managers and Wilmington Trust's legal department, Kennedy completed and filed with the California Health and Human Services Agency (CHHSA) a Report of Suspected Dependent Adult/Elder

Abuse form. JX-31. In the designated boxes in the CHHSA form, Kennedy

identified Rogers as the victim, Shawna Baker as the suspected abuser, "financial"

as the type of abuse, and the Roen Trust as the "targeted account." Kennedy

attached to the form a two-page, single-spaced summary of her dealings with

Rogers in November and December 2014 that she said "caused [her] to be

concerned about [Rogers's] welfare." *Id.* Kennedy testified that someone from

CHHSA called her to let her know "they were going to investigate the claim." Tr.

508. But neither Kennedy nor anyone else from Wilmington Trust were able to

say whether the investigation was pursued by CHHSA or any other authority in

California. *Id.* No one from Wilmington Trust ever followed up with CHHSA to

make that determination. And neither side presented evidence at trial that would

make it possible to tell what became of Kennedy's report of suspected abuse.

Shawna Baker died before trial. Steve Baker accompanied Rogers at trial

each day but did not testify.

## CONCLUSIONS OF LAW

### I.      **Breach of Fiduciary Duty Claim**

To sustain its breach of fiduciary duty claim, Premier was required to prove

by a preponderance of the evidence that Wilmington Trust breached a fiduciary

duty owed to the Trust and that the Trust suffered damages as a result of the

breach. *Glick v. KF Pecksland LLC*, No. 12624-CB, 2017 WL 5514360, at *19

24

(Del. Ch. Nov. 17, 2017). Because of the Trust Agreement's exculpation clause, Premier was also required to establish that Wilmington Trust's actions or lack of actions constituted fraud, willful misconduct, or gross negligence. *In re Rohlf*, C.A. No. 4464-MG, 2011 WL 3201798, at *2 (Del. Ch. July 12, 2011) (holding that whether a trustee satisfied or breached fiduciary duties under a trust agreement is governed by the language of the trust agreement itself). Under Delaware law, "gross negligence" is an "extreme departure from the ordinary standard of care that signifies more than ordinary inadvertence or inattention." *Hecksher v. Fairwinds Baptist Church, Inc.*, 115 A.3d 1187, 1199 (Del. 2015) (citations and internal quotation marks omitted).

Premier alleges seven instances of Wilmington Trust breaching its fiduciary duties to the Trust. It alleges first a duty breach based on Wilmington Trust's "maintain[ing] an investment portfolio dominated by the [Wilmington Private Funds] which acted as a lockup and fail[ing] to disclose this risk to Rogers." D.I. 359 at 26. Premier states that "[t]he lockup [was] occasioned by the $36 million invested in [the Wilmington Private Funds]." *Id.* Although I am disturbed by Wilmington Trust's failure to disclose to Rogers WTIM's unwavering (and unwritten) practice of never consenting to a transfer of assets from the Wilmington Private Funds to another financial institution, the Trust's last investment in a Wilmington Private Fund occurred in 2011. When Wilmington Trust argued at

25

trial that any claim based on the Trust's purchase of Wilmington Private Fund shares would be barred by the statute of limitations, I asked Plaintiffs' counsel: "are you alleging that the purchase of the private funds is part of your case?" Plaintiffs' counsel replied: "No, we're not." Tr. 47. Accordingly, Plaintiffs abandoned any fiduciary duty breach claim premised on Wilmington Trust's investment in a Wilmington Private Fund.

Premier next argues that Wilmington Trust "took for itself excess fees not permitted under the Trust Agreement." D.I. 359 at 28. Premier, however, never alleged in the Amended Complaint or the Pretrial Order and never alleged at trial that Wilmington Trust collected fees that exceeded what the Trust Agreement permitted. Accordingly, Premier waived this theory of liability. *Dean v. Brandywine Studios, Inc.*, No. Civ.A. 99–679–KAJ, 2003 WL 299362, at *1 (D. Del. Feb. 10, 2003) ("Having failed to raise the issue in the pretrial order and having failed to address it at trial, defendants have waived any right they might have had to assert a statute of limitations defense."); *Colli v. Wirth*, No. 94 Civ. 3234 (LBS), 1996 WL 442835, at *1 (S.D.N.Y. Aug. 6, 1996) ("It is an established procedural principle that a party's failure to include a legal theory or defense in the pre-trial order results in its subsequent abandonment or waiver.").

Even if this liability theory were not waived, I would reject it for failure of proof and on statute of limitations grounds. First, under the terms of the Trust

Agreement, Advisors are entitled to receive "a reasonable sum, to be fixed by the Trustee and the Advis[o]rs to the Trustee, for services rendered by them." JX-02 at 31. Neither of Plaintiffs' fiduciary experts performed or offered at trial any analysis about the reasonableness of the fees charged to the Trust. Second, Wilmington Trust disclosed the fee schedule for the Trust's investments to Rogers in July 2011 and explained the fee calculations in a statement provided to her in December 2012. DX-40; DX-59. This suit was not filed until March 2017; and thus any claim based on Wilmington Trust's fees is barred by 12 Del. C. § 3585, which precludes claims brought more than two years after a "beneficiary was sent a report that . . . adequately disclose[d] the facts constituting a claim."

Premier next alleges a fiduciary duty breach based on Wilmington Trust's "fail[ure] to assess the suitability of the Trust's portfolio for Rogers and the remaindermen." D.I. 359 at 30. Here, again, I was disturbed by the evidence at trial. Sullivan's demeanor and the substance of his testimony made clear to me that he was indifferent to and largely ignorant of Rogers's personal circumstances. His articulation of the reasons for selecting the Wilmington Private Funds— essentially that they were "very good" and "very diversified"—was perfunctory.

But Delaware law does not require a trustee to select investments that are "suitable" for trust beneficiaries. Instead, under 12 Del. C. § 3302(a), a trustee is

obligated to select investments that "attain the purposes" of the Trust.  Section

3302(a) provides:

> When investing, reinvesting, purchasing, acquiring,
> exchanging, retaining, selling and managing property for
> the benefit of another, a fiduciary shall act with the care,
> skill, prudence and diligence under the circumstances
> then prevailing that a prudent person acting in a like
> capacity and familiar with such matters would use to
> attain the purposes of the account.  In making investment
> decisions, a fiduciary may consider the general economic
> conditions, the anticipated tax consequences of the
> investment and the anticipated duration of the account
> and the needs of the beneficiaries.

12 Del. C. §3302(a).

There is no express statement of purpose in the Trust Agreement.  But the

totality of the Agreement indicates that it was the settlor's intent for the Trust to

last for multiple future generations.  The Agreement grants the trustee, for

example, "uncontrolled discretion" to "distribute so much, if any, of the net income

and principal of the Resulting Trust to or for the benefit of the Primary

Beneficiary."  JX-02.  And the broad grant of authority to invest in any securities

that the trustee may deem advisable indicates an intent to maintain the

independence of the trustee from any given beneficiary.  Premier did not prove by

a preponderance of the evidence that Sullivan's balanced growth investment

choices—which resulted in $25 million in gains and $12 million in distributions to

Rogers from 2009 through 2014—were inconsistent with the purposes of the Trust.

It therefore failed to prove that the decisions to make those investments constituted fraud, willful misconduct, or gross negligence.

Premier next argues that Wilmington Trust breached its fiduciary duties because it "had an inherent conflict of interest when it acted as the Trustee and Advis[o]r." D.I. 359 at 31. Neither the Trust Agreement nor Delaware law, however, prohibits a single entity from acting as both trustee and advisor. Moreover, when Rogers appointed Wilmington Trust to act as the advisor of the Trust, it was already acting as trustee. And Rogers effectuated the appointment with the assistance of a personal attorney.

Next, Premier argues that Wilmington Trust breached its fiduciary duties by "ma[king] misrepresentations to Rogers and Premier regarding the restrictions on the [Wilmington Private Funds]." D.I. 359 at 32. According to Premier, Wilmington Trust "is presented with" a "mutually exclusive choice": either (1) it committed securities fraud by failing to disclose in the PPMs that WTIM would never consent to a transfer of assets to another financial institution or (2) it "made false statements to Premier in January 2015 when it was [sic] represented that the [Wilmington Private Funds] could not be transferred outside [Wilmington Trust]." *Id.* With respect to the first "choice," although I agree and am troubled by the fact that Wilmington Trust failed to disclose in the PPMs it provided Rogers in 2010 and 2011 that WTIM would never consent to an outside transfer of the Wilmington

29

Private Funds, I need not decide whether that failure constituted securities fraud, because the statute of limitations would bar such a claim. *See State v. Attarian*, No. ID 1303009480, 2014 WL 4782859, at *5 (Del. Super. Ct. Sept. 8, 2014) ("[Delaware] securities-fraud allegations are subject to a five[-]year statute of limitations"). As for the second "choice," the record evidence is undisputed that WTIM would never have consented to a transfer of the Wilmington Private Funds to an outside entity. Thus, Wilmington Trust's statements to Premier in January 2015 that the Private Funds were not transferrable were not false.

Premier next argues that Wilmington Trust breached its fiduciary duties because it "did not undertake any tax or financial planning for the Trusts' $61.5 million corpus." D.I. 359 at 33. In support of this argument, Premier relied on the Rule 30(b)(6) deposition testimony of Katherine Burns, whom Wilmington Trust offered as its corporate designee on the topic of "financial or tax planning Wilmington Trust did for the [Roen] trust." JX-38 at 7:23–8:9. The following exchange occurred during Burns's testimony:

> Q.   Do you know what the tax planning was done for the Roen Resulting Trust?
> A.   No.
> Q.   Do you know if any financial planning was done for the Roen Resulting Trust?
> A.   I do not.
> Q.   Do you know if any tax planning was done for the Roen Resulting Trust?
> A.   Not to my knowledge.

30

> Q.     Do you know how – if or how tax consequences were
> communicated to Ms. Rogers?
> A.     I do not.

JX-38 at 77:13–78:6.

Wilmington Trust offered no explanation for this testimony at trial; nor did it

mention the testimony it in its posttrial answering brief.  The testimony constitutes

a binding admission by Wilmington Trust that it did not engage in tax planning for

the Trust and did not communicate to Rogers the tax consequences of the

investments it made for the Trust.  When a corporate designee for a Rule 30(b)(6)

deposition topic lacks the ability to answer questions about the topic, the

corporation is bound by the witness's "not to my knowledge" answers to questions

on the topic.  *Ierardi v. Lorillard, Inc.*, Civ. A. No. 90-7049, 1991 WL 158911, at

*3 (E.D. Pa. Aug. 13, 1991); *QBE Ins. Corp. v. Jorda Enters., Inc.*, 277 F.R.D.

676, 690 (S.D. Fla. 2012).[1]

Nonetheless, Premier never explained, let alone established, how

Wilmington Trust's failure to engage in tax planning proximately caused damage

---

[1] Wilmington Trust cites the trial testimony of Sullivan and Capuano as evidence
that its "selection of investments took into account relevant tax considerations" and
that "the Wilmington Private Funds offered tax deferrals in a way that is not
possible with mutual funds." D.I. 362 at 40.  Burns's testimony precluded
Wilmington Trust from offering at trial testimony to show that it engaged in tax
planning. *QBE Ins. Corp.*, 277 F.R.D. at 690.  But in any event, the conclusory
testimony cited by Wilmington Trust did not establish that Wilmington Trust ever
formulated a tax plan for the Trust.

31

to the Trust.  Accordingly, its breach of fiduciary duty claim fails insofar as it is

based on lack of tax planning.  *See Glick*, 2017 WL 5514360, at \*19 ("[T]o sustain

their [breach of fiduciary duty] claim . . ., [plaintiffs] have the burden to prove, by

a preponderance of the evidence, not only that [the defendant] breached a fiduciary

duty owed to them, but that they suffered damages. . . .").

　　　　Lastly, Premier argues that Wilmington Trust breached its fiduciary duties

by not delivering the Private Funds' 2014 K-1s to Premier by September 2015.

D.I. 359 at 33.  I rejected this argument at trial.  Tr. 1250–51.  Premier failed to

establish by a preponderance of the evidence that Wilmington Trust did not deliver

the 2014 K-1s.  The unrebutted testimony of Richard Capuano established to my

satisfaction that Wilmington Trust sent Premier all required K-1s before September

2015.

　　　　In sum, I do not find that Wilmington Trust is liable for a breach of its

fiduciary duties.

## II.　　Equitable Fraud Claim[2]

　　　　Premier's equitable fraud claim is based on alleged false, misleading, and

incomplete statements made by Kennedy in her January 23 email and January 27

---

[2] In the Amended Complaint, Premier alleged a "constructive fraud" claim.  In its
posttrial brief, Premier styles the claim as "equitable fraud."  Delaware law equates
equitable fraud with constructive fraud.  *See In re Wayport, Inc. Litig.*, 76 A.3d
296, 327 (Del. Ch. 2013).

letter about the need to liquidate the Wilmington Private Funds and in a July 2015 email to Premier about the availability of the Private Funds' 2014 K-1s.

Under Delaware law, a claim of equitable fraud "requires special equities, typically the existence of some form of fiduciary relationship, such as that between a director and stockholder or a trustee and *cestui que trust*[.]" *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 144 (Del. Ch. 2009). "The elements of equitable fraud are similar to those for common law fraud, except that the claimant need not show that the respondent acted knowingly or recklessly—innocent or negligent misrepresentations or omissions suffice." *Zebroski v. Progressive Direct Ins. Co.*, C.A. No. 8816-VCP, 2014 WL 2156984, at *7 (Del. Ch. Apr. 30, 2014) (internal quotation marks and citations omitted). As the court explained in *Zebroski*, "the concept of equitable fraud is more flexible [than common law fraud] and includes all willful or intentional acts, omissions, and concealments which involve a breach in either legal or equitable duty, trust, or confidence, and are injurious to another, or by which an undue or unconscientious advantage over another is obtained." *Id.* (internal quotation marks and citation omitted).

Wilmington Trust argues that Premier's equitable fraud claim fails because it is duplicative of Premier's breach of fiduciary duty claim. D.I. 362 at 47. There is Delaware case law that supports the proposition that equitable fraud "describe[s] a breach of fiduciary duty," and is not "a separate, independent tort." *Parfi*

33

*Holding AB v. Mirror Image Internet, Inc.*, 794 A.2d 1211, 1236–37 (Del. Ch. 2001); *see also In re Wayport, Inc. Litig.*, 76 A.3d 296, 327 (Del. Ch. 2013) (holding that breach of fiduciary duty claim "render[ed] [plaintiff's] constructive fraud count redundant and superfluous"). And Premier's fiduciary duty and equitable fraud claims arise out of the same events. But in its posttrial briefing Premier has based its fraud claim on alleged false and misleading statements that it does not rely on in pressing its breach of fiduciary duty claim. Accordingly, I will treat the equitable fraud claim as a separate tort in this case.

Although innocent or negligent misrepresentations or omissions may as a general matter be sufficient to establish an equitable fraud claim, *Zebroski*, 2014 WL 2156984, at *7, under the express terms of the Trust Agreement, Wilmington Trust can only be liable if its actions constituted fraud (i.e., common law fraud), willful misconduct, or gross negligence. Thus, the question before me is whether Premier established by a preponderance of the evidence that Kennedy's challenged statements and omissions were at a minimum grossly negligent.

I have already made a finding that Kennedy implied in her January 23 email that Premier had no choice but to liquidate the Wilmington Private Funds. Dreschler reasonably inferred from the email that liquidation was Premier's only option. But Kennedy's January 27 letter suggested that liquidation was not a foregone conclusion.

Both Wilmington Trust and Premier bear responsibility for the 2015 liquidation of the Trust's assets in the Wilmington Private Funds. The January 23 email and the January 27 letter should have been clearer, and, as the Advisor (and former Trustee) of the Trust, Wilmington Trust should have explained to Premier that Wilmington Trust could act as a custodian and hold the Trust's Wilmington Private Fund assets to avoid a premature liquidation that would result in unnecessary tax liabilities. For its part, Premier was a sophisticated corporation that managed more than 5,000 trusts with more than $2 billion in assets. It should have asked Wilmington Trust what "arrangement" Wilmington Trust professed to be "amenable to" that could "spread the tax liability over multiple tax years." JX-23.

Both parties failed to exercise responsibly their duties here. But Premier is the plaintiff. And it did not establish by a preponderance of the evidence that Wilmington Trust's failures with respect to its communications with Premier constituted the kind of "extreme departure" from industry norms that is required for a finding of gross negligence.

Premier also argues that Kennedy "made untrue statement regarding the availability of [Wilmington Private Fund] K-1s in July 2015." D.I. 358 at 42. In July 2015, Premier wrote Kennedy, asking "[w]hen do you expect the 2014 K-1's to be available for the Wilmington proprietary funds?" JX-33. Kennedy

responded by email: "I have been informed that K1s for the Wilmington proprietary funds will be available in early September." *Id.* Premier argues this was a false statement because four K-1s for the Wilmington Private Funds were prepared in March 2015. *See* D.I. 359 at 42 (citing DX-128).

As an initial matter, Kennedy's statement was that she "*[had] been informed that K1s for the Wilmington proprietary funds will be available in early September.*" JX-33 (emphasis added). Premier has put forward no evidence to suggest that Kennedy had not been so informed. Thus, there is no evidence that this was a false statement. But even if I were to read Kennedy's email less literally, I find that a reasonable interpretation of Kennedy's statement is that she told Premier that not all the K-1s would be available until early September. Although it is true that several K-1s had been prepared in March 2015, the remainder of the K-1s for the Wilmington Private Funds were not prepared until September 2015. *See* Tr. at 717–718 (testimony of Richard Capuano). Therefore, even under a less literal reading, Kennedy's statement was true, and Wilmington Trust cannot be liable for equitable fraud.

## III.   Investment Advisers Act Claim

Premier argues that Wilmington Trust violated the U.S. Investment Advisers Act of 1940, 15 U.S.C. § 80b-1 *et seq.*, and seeks as a remedy "restitution of the fees [Wilmington Trust] collected from the [Roen Trust.]" D.I. 359 at 49. The

Investment Advisers Act, however, does not authorize a private right of action for restitution. Rather, it creates only "a limited private remedy . . . to void an investment advisers contract[.]" *Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 24 (1979). "[T]he Act confers no other private causes of action, legal or equitable." *Id.* Because Premier does not seek to void an investment adviser's contract, its claim for relief under the Investment Advisers Act fails.

## IV.    Financial Elder Abuse Claim

Rogers accuses Wilmington Trust of committing financial elder abuse in violation of section 15610.30 of the California Welfare & Institutions Code. Although Rogers faults Wilmington Trust for "never attempt[ing] to negotiate a larger ownership stake for Rogers [in the cattle business operation owned by her and the Bakers] and . . . wait[ing] a year to actually file the report of suspected elder abuse," D.I. 359 at 23, she does not base her elder abuse claim on those failures. Rather, the gravamen of her claim is that Wilmington Trust "knew or should have known that once the Trust monies were placed in the [Wilmington Private Funds,] Rogers was 'hostage' to [Wilmington Trust] as the Trustee—a de facto retention of the Trust with [Wilmington Trust as Trustee] absent Rogers incurring adverse tax consequences." *Id.* at 45.

Section 15610.30(a) provides that

> "[f]inancial abuse" of an elder or dependent adult occurs
> when a person or entity does any of the following:
>
> (1) Takes, secretes, appropriates, obtains, or retains real
> or personal property of an elder or dependent adult for a
> wrongful use or with intent to defraud, or both.
>
> (2) Assists in taking, secreting, appropriating, obtaining,
> or retaining real or personal property of an elder or
> dependent adult for a wrongful use or with intent to
> defraud, or both.
>
> (3) Takes, secretes, appropriates, obtains, or retains, or
> assists in taking, secreting, appropriating, obtaining, or
> retaining, real or personal property of an elder or
> dependent adult by undue influence, as defined in Section
> 15610.70.

Cal. Welf. & Inst. Code § 15610.30.  Under section 15610.30(c), "a person or

entity takes, secretes, appropriates, obtains, or retains real or personal property

when an elder or dependent adult is deprived of any property right, . . . regardless

of whether the property is held directly or by a representative of an elder or

dependent adult."

Assuming that section 15610.30 creates an independent cause of action for

elder abuse, Rogers's claim fails for at least two reasons.[3]  First, Rogers did not

---

[3] Courts in California are divided over whether section 15610.3 creates a cause of
action or provides enhanced remedies for other causes of action. *See Gross v.
Wells Fargo Bank*, No. 13-cv-1250-W(BGS), 2014 WL 232272, at *5 (S.D. Cal.
Jan. 21, 2014).

establish that Wilmington Trust took her property. Assuming *arguendo* that causing adverse tax consequences could constitute a taking of property, it was Premier, not Wilmington Trust, that ordered the liquidation of the Trust's assets in the Wilmington Private Funds that caused the adverse tax consequences. And, as discussed above, an immediate liquidation and its adverse tax consequences could have been avoided.[4] Second, Rogers points to no evidence that Wilmington Trust acted with an intent to defraud or exercise undue influence over her when it invested Trust assets in the Wilmington Private Funds or executed Premier's order to liquidate the Funds in 2015.

## CONCLUSION

For the foregoing reasons, I do not find Wilmington Trust liable for any of the claims brought by Plaintiffs Premier Trust, acting as trustee of the Roen Trust on behalf of the Roen Trust, and Frieda Mae Rogers.

The Court will issue an Order consistent with this Memorandum Opinion.

---

[4] I also note that Wilmington Trust last used Trust assets to purchase shares in the Wilmington Private Funds in January 2011—nine months before Rogers turned 65. Thus, Wilmington Trust's use of Rogers's property to buy shares in the Funds could not form the basis of an elder abuse claim under section 15310.30. *See* Cal. Welf. & Inst. Code § 15610.27 (defining "elder" as "any person residing in this state, 65 years of age or older").